MEMBERS OF THE CITY COUNCIL OF THE CITY OF
LOS ANGELES ET AL. *v.* TAXPAYERS FOR
VINCENT ET AL.

No. 82–975.   Argued October 12, 1983—Decided May 15, 1984

790

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 818.

*Anthony Saul Alperin* argued the cause for appellants. With him on the briefs were *Ira Reiner* and *Gary R. Netzer*.

*Wayne S. Canterbury* argued the cause and filed a brief for appellees.*

JUSTICE STEVENS delivered the opinion of the Court.

Section 28.04 of the Los Angeles Municipal Code prohibits the posting of signs on public property.[1]   The question pre-

---

*Briefs of *amici curiae* urging reversal were filed for the City of Antioch by *William R. Galstan;* and for the National Institute of Municipal Law Officers by *J. Lamar Shelley, John W. Witt, Henry W. Underhill, Jr., Benjamin L. Brown, Roy D. Bates, James B. Brennan, Roger F. Cutler, Clifford D. Pierce, Jr., Walter M. Powell, Frederick A. O. Schwarz, Jr., William H. Taube, William I. Thornton, Jr., Max P. Zall,* and *Charles S. Rhyne.*

A brief of *amici curiae* urging affirmance was filed by *Alan L. Schlosser, Amitai Schwartz, Fred Okrand,* and *Neil H. O'Donnell* for the American Civil Liberties Union et al.

[1] The ordinance reads as follows:

"Sec. 28.04.   Hand-bills, signs-public places and objects:

"(a) No person shall paint, mark or write on, or post or otherwise affix, any hand-bill or sign to or upon any sidewalk, crosswalk, curb, curbstone,

sented is whether that prohibition abridges appellees' freedom of speech within the meaning of the First Amendment.[2]

In March 1979, Roland Vincent was a candidate for election to the Los Angeles City Council. A group of his supporters known as Taxpayers for Vincent (Taxpayers) entered into a contract with a political sign service company known as Candidates' Outdoor Graphics Service (COGS) to fabricate and post signs with Vincent's name on them. COGS produced 15- by 44-inch cardboard signs and attached them to utility poles at various locations by draping them over crosswires

street lamp post, hydrant, tree, shrub, tree stake or guard, railroad trestle, electric light or power or telephone or telegraph or trolley wire pole, or wire appurtenance thereof or upon any fixture of the fire alarm or police telegraph system or upon any lighting system, public bridge, drinking fountain, life buoy, life preserver, life boat or other life saving equipment, street sign or traffic sign.

"(b) Nothing in this section contained shall apply to the installation of terrazzo sidewalks or sidewalks of similar construction, sidewalks permanently colored by an admixture in the material of which the same are constructed, and for which the Board of Public Works has granted a written permit.

"(c) Any hand-bill or sign found posted, or otherwise affixed upon any public property contrary to the provisions of this section may be removed by the Police Department or the Department of Public Works. The person responsible for any such illegal posting shall be liable for the cost incurred in the removal thereof and the Department of Public Works is authorized to effect the collection of said cost.

"(d) Nothing in this section shall apply to the installation of a metal plaque or plate or individual letters or figures in a sidewalk commemorating an historical, cultural, or artistic event, location or personality for which the Board of Public Works, with the approval of the Council, has granted a written permit.

"(e) Nothing in this section shall apply to the painting of house numbers upon curbs done under permits issued by the Board of Public Works under and in accordance with the provisions of Section 62.96 of this Code."

[2] The First Amendment provides: "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." Under the Fourteenth Amendment, city ordinances are within the scope of this limitation on governmental authority. *Lovell* v. *Griffin*, 303 U. S. 444 (1938).

which support the poles and stapling the cardboard together at the bottom. The signs' message was: "Roland Vincent— City Council."

Acting under the authority of § 28.04 of the Municipal Code, employees of the city's Bureau of Street Maintenance routinely removed all posters attached to utility poles and similar objects covered by the ordinance, including the COGS signs. The weekly sign removal report covering the period March 1–March 7, 1979, indicated that among the 1,207 signs removed from public property during that week, 48 were identified as "Roland Vincent" signs. Most of the other signs identified in that report were apparently commercial in character.[3]

On March 12, 1979, Taxpayers and COGS filed this action in the United States District Court for the Central District of California, naming the city, the Director of the Bureau of Street Maintenance, and members of the City Council as defendants.[4] They sought an injunction against enforcement of the ordinance as well as compensatory and punitive damages. After engaging in discovery, the parties filed cross-motions for summary judgment on the issue of liability. The District Court entered findings of fact, concluded that the ordinance was constitutional, and granted the City's motion.

The District Court's findings do not purport to resolve any disputed issue of fact; instead, they summarize material in the record that appears to be uncontroverted. The findings recite that the principal responsibility for locating and remov-

---

[3] The first 10 signs identified on the March 9 weekly report were:

| "Leonard's Nite Club | 11 | Raul Palomo, Jr. | 12 |
|---|---|---|---|
| Alamar Travel Bureau Inc. | 5 | Roland Vincent | 48 |
| The Item—Madam Wongs | 13 | The American Club | 2 |
| Salon Broadway | 14 | Rose Royce | 11 |
| Vernon Auditorium—Apache | | Total Experience | 13" |
| Jupiter | 20 | | |
| App. 73. | | | |

[4] For convenience we shall refer to these parties as simply as the "City."

ing signs and handbills posted in violation of § 28.04 is assigned to the Street Use Inspection Division of the city's Bureau of Street Maintenance. The court found that both political and nonpolitical signs are illegally posted and that they are removed "without regard to their content."[5]

After explaining the purposes for which the City's zoning code had been enacted, and noting that the prohibition in § 28.04 furthered those purposes, the District Court found that the large number of illegally posted signs "constitute a clutter and visual blight."[6] With specific reference to the posting of the COGS signs on utility pole crosswires, the District Court found that such posting "would add somewhat to the blight and inevitably would encourage greatly increased posting in other unauthorized and unsightly places . . . ."[7]

In addition, the District Court found that placing signs on utility poles creates a potential safety hazard, and that other violations of § 28.04 "block views and otherwise cause traffic hazards."[8] Finally, the District Court concluded that the sign prohibition does not prevent taxpayers or COGS "from

---

[5] App. to Juris. Statement 17a.

[6] Id., at 18a.

"The Los Angeles Planning and Zoning Code was enacted in part to encourage the most appropriate use of land; to conserve and stabilize the value of property; to provide adequate open spaces for light and air; to prevent and fight fire; to lessen congestion on streets; to facilitate adequate provisions for community utilities and facilities and to promote health, safety, and the general welfare, all in accordance with a comprehensive plan." Finding 11, App. to Juris. Statement 17a.

[7] App. to Juris. Statement 18a. The District Court's Finding 14 reads, in full, as follows:

"The large number of signs illegally posted on the items of public and utility property enumerated in Section 28.04 constitute a clutter and visual blight. The posting of signs on utility pole cross wires for which the plaintiffs [seek] authorization would add somewhat to the blight and inevitably would encourage greatly increased posting in other unauthorized and unsightly places by people not aware of the distinction the plaintiffs seek to make."

[8] Finding 17, App. to Juris. Statement 18a.

exercising their free speech rights on the public streets and in other public places; they remain free to picket and parade, to distribute handbills, to carry signs and to post their signs and handbills on their automobiles and on private property with the permission of the owners thereof."[9]

In its conclusions of law the District Court characterized the esthetic and economic interests in improving the beauty of the City "by eliminating clutter and visual blight" as "legitimate and compelling."[10] Those interests, together with the interest in protecting the safety of workmen who must scale utility poles and the interest in eliminating traffic hazards, adequately supported the sign prohibition as a reasonable regulation affecting the time, place, and manner of expression.

The Court of Appeals did not question any of the District Court's findings of fact, but it rejected some of its conclusions of law. The Court of Appeals reasoned that the ordinance was presumptively unconstitutional because significant First Amendment interests were involved. It noted that the City had advanced three separate justifications for the ordinance, but concluded that none of them was sufficient. The Court of Appeals held that the City had failed to make a sufficient showing that its asserted interests in esthetics and preventing visual clutter were substantial because it had not offered to demonstrate that the City was engaged in a comprehensive effort to remove other contributions to an unattractive environment in commercial and industrial areas. The City's interest in minimizing traffic hazards was rejected because it was readily apparent that no substantial traffic problems would result from permitting the posting of certain kinds of signs on many of the publicly owned objects covered by the ordinance. Finally, while acknowledging that a flat prohibition against signs on certain objects such as fire hydrants and traffic signals would be a permissible method of prevent-

---

[9] Finding 18, App. to Juris. Statement 18a.

[10] Conclusion of Law No. 5, App. to Juris. Statement 19a.

ing interference with the intended use of public property, and that regulation of the size, design, and construction of posters, or of the method of removing them, might be reasonable, the Court of Appeals concluded that the City had not justified its total ban.[11]

In its appeal to this Court the City challenges the Court of Appeals' holding that § 28.04 is unconstitutional on its face. Taxpayers and COGS defend that holding and also contend that the ordinance is unconstitutional as applied to their posting of political campaign signs on the crosswires of utility poles. There are two quite different ways in which a statute or ordinance may be considered invalid "on its face"—either because it is unconstitutional in every conceivable application, or because it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally "overbroad." We shall analyze the "facial" challenges to the ordinance, and then address its specific application to appellees.

## I

The seminal cases in which the Court held state legislation unconstitutional "on its face" did not involve any departure from the general rule that a litigant only has standing to vindicate his own constitutional rights. In *Stromberg* v. *California*, 283 U. S. 359 (1931),[12] and *Lovell* v. *Griffin*, 303 U. S.

---

[11] Nevertheless, the court acknowledged that should subsequent experience with a less comprehensive prohibition prove ineffective in achieving the City's goals, it might reenact the very ordinance the court had just struck down. As authority for this procedure, the court cited Ratner, The Function of the Due Process Clause, 116 U. Pa. L. Rev. 1048, 1110–1111 (1968).

[12] The question before the Court was whether Stromberg could constitutionally be convicted for displaying a red flag as a symbol of opposition to organized government. Stromberg was a supervisor at a summer camp for children. The camp's curriculum stressed class consciousness and the solidarity of workers. Each morning at the camp a red flag was raised and the children recited a pledge of allegiance to the "workers' flag." The stat-

444 (1938),[13] the statutes were unconstitutional as applied to the defendants' conduct, but they were also unconstitutional on their face because it was apparent that any attempt to enforce such legislation would create an unacceptable risk of the suppression of ideas.[14]   In cases of this character a holding of facial invalidity expresses the conclusion that the statute

ute under which Stromberg was convicted prohibited peaceful display of a symbol of opposition to organized government.   The Court wrote:

"The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.   A statute which upon its face, and as authoritatively construed, is so vague and indefinite as to permit the punishment of the fair use of this opportunity is repugnant to the guaranty of liberty contained in the Fourteenth Amendment.   The . . . statute being invalid upon its face, the conviction of the appellant . . . must be set aside."   283 U. S., at 369–370.

[13] Lovell was convicted of distributing religious pamphlets without a license.   A local ordinance required a license to distribute any literature, and gave the chief of police the power to deny a license in order to abate anything he considered to be a "nuisance."   The Court wrote:

"We think that the ordinance is invalid on its face.   Whatever the motive which induced its adoption, its character is such that it strikes at the very foundation of the freedom of the press by subjecting it to license and censorship.   The struggle for the freedom of the press was primarily directed against the power of the licensor.   It was against that power that John Milton directed his assault by his 'Appeal for the Liberty of Unlicensed Printing.'   And the liberty of the press became initially a right to publish 'without a license what formerly could be published only with one.'   While this freedom from previous restraint upon publication cannot be regarded as exhausting the guaranty of liberty, the prevention of that restraint was a leading purpose in the adoption of the constitutional provision."   303 U. S., at 451–452 (footnote omitted).

[14] In Stromberg, the only justification for the statute was the suppression of ideas.   In Lovell, since no attempt was made to tailor the licensing requirement to a substantive evil unrelated to the suppression of ideas, the statute created an unacceptable risk that it would be used to suppress. Under such statutes, any enforcement carries with it the risk that the enforcement is being used merely to suppress speech, since the statute is not aimed at a substantive evil within the power of the government to prohibit.

could never be applied in a valid manner. Such holdings[15] invalidated entire statutes, but did not create any exception from the general rule that constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court.

Subsequently, however, the Court did recognize an exception to this general rule for laws that are written so broadly that they may inhibit the constitutionally protected speech of third parties. This "overbreadth" doctrine has its source in *Thornhill* v. *Alabama,* 310 U. S. 88 (1940). In that case the Court concluded that the very existence of some broadly written statutes may have such a deterrent effect on free expression that they should be subject to challenge even by a party whose own conduct may be unprotected.[16] The Court

---

[15] Subsequent cases have continued to employ facial invalidation where it was found that every application of the statute created an impermissible risk of suppression of ideas. See *Saia* v. *New York,* 334 U. S. 558 (1948) (ordinance prohibited use of loudspeaker in public places without permission of the chief of police whose discretion was unlimited); *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940) (ordinance required license to distribute religious literature without standards for the exercising of licensing discretion); *Schneider* v. *State,* 308 U. S. 147 (1939) (ordinances prohibited distributing leaflets without a license and provided no standards for issuance of licenses); *Hague* v. *CIO,* 307 U. S. 496, 516 (1939) (plurality opinion) (statute permitted city to deny permit for a public demonstration subject only to the uncontrolled discretion of the director of public safety).

[16] "It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion. One who might have had a license for the asking may therefor call into question the whole scheme of licensing when he is prosecuted for failure to procure it. A like threat is inherent in a penal statute, like that in question here, which does not aim specifically at evils within the allowable area of state control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press. The existence of such a statute, which readily lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure, results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview." 310 U. S., at 97–98 (citation omitted).

has repeatedly held that such a statute may be challenged on its face even though a more narrowly drawn statute would be valid as applied to the party in the case before it.[17]   This exception from the general rule is predicated on "a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick* v. *Oklahoma,* 413 U. S. 601, 612 (1973).

In the development of the overbreadth doctrine the Court has been sensitive to the risk that the doctrine itself might sweep so broadly that the exception to ordinary standing requirements would swallow the general rule.   In order to decide whether the overbreadth exception is applicable in a particular case, we have weighed the likelihood that the statute's very existence will inhibit free expression.

> "[T]here comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe.   To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a

---

[17] A representative statement of the doctrine is found in *Gooding* v. *Wilson,* 405 U. S. 518 (1972).

"At least when statutes regulate or proscribe speech and when 'no readily apparent construction suggests itself as a vehicle for rehabilitating the statutes in a single prosecution,' *Dombrowski* v. *Pfister,* 380 U. S. 479, 491 (1965), the transcendent value to all society of constitutionally protected expression is deemed to justify allowing 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity,' *id.,* at 486.   This is deemed necessary because persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression." *Id.,* at 520–521 (citations omitted).

See also, *e. g., Dombrowski* v. *Pfister,* 380 U. S. 479, 494 (1965).

statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick* v. *Oklahoma*, 413 U. S., at 615 (citation omitted).[18]

The concept of "substantial overbreadth" is not readily reduced to an exact definition. It is clear, however, that the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.[19] On the contrary, the requirement of substantial overbreadth stems from the underlying justification for the overbreadth exception itself— the interest in preventing an invalid statute from inhibiting the speech of third parties who are not before the Court.

"The requirement of substantial overbreadth is directly derived from the purpose and nature of the doctrine. While a sweeping statute, or one incapable of limitation,

---

[18] See also *CSC* v. *Letter Carriers*, 413 U. S. 548, 580–581 (1973).

[19] "We have never held that a statute should be held invalid on its face merely because it is possible to conceive of a single impermissible application, and in that sense a requirement of substantial overbreadth is already implicit in the doctrine." *Broadrick*, 413 U. S., at 630 (BRENNAN, J., dissenting).

"Simply put, the doctrine asserts that an overbroad regulation of speech or publication may be subject to facial review and invalidation, even though its application in the instant case is constitutionally unobjectionable. Thus, a person whose activity could validly be suppressed under a more narrowly drawn law is allowed to challenge an overbroad law because of its application to others. The bare possibility of unconstitutional application is not enough; the law is unconstitutionally overbroad only if it reaches *substantially* beyond the permissible scope of legislative regulation. Thus, the issue under the overbreadth doctrine is whether a government restriction of speech that is arguably valid as applied to the case at hand should nevertheless be invalidated to avoid the substantial prospect of unconstitutional application elsewhere." Jeffries, Rethinking Prior Restraint, 92 Yale L. J. 409, 425 (1983) (emphasis supplied).

However, where the statute unquestionably attaches sanctions to protected conduct, the likelihood that the statute will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack. *Erznoznik* v. *City of Jacksonville*, 422 U. S. 205, 217 (1975).

has the potential to repeatedly chill the exercise of expressive activity by many individuals, the extent of deterrence of protected speech can be expected to decrease with the declining reach of the regulation." *New York v. Ferber*, 458 U. S. 747, 772 (1982) (footnote omitted).

In short, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds. See *Erznoznik v. City of Jacksonville*, 422 U. S. 205, 216 (1975). See also *Ohralik v. Ohio State Bar Assn.*, 436 U. S. 447, 462, n. 20 (1978); *Parker v. Levy*, 417 U. S. 733, 760–761 (1974).

The Court of Appeals concluded that the ordinance was vulnerable to an overbreadth challenge because it was an "overinclusive" response to traffic concerns and not the "least drastic means" of preventing interference with the normal use of public property. This conclusion rested on an evaluation of the assumed effect of the ordinance on third parties, rather than on any specific consideration of the impact of the ordinance on the parties before the court. This is not, however, an appropriate case to entertain a facial challenge based on overbreadth. For we have found nothing in the record to indicate that the ordinance will have any different impact on any third parties' interests in free speech than it has on Taxpayers and COGS.

Taxpayers and COGS apparently would agree that the prohibition against posting signs on most of the publicly owned objects mentioned in the ordinance is perfectly reasonable. Thus, they do not dispute the City's power to proscribe the attachment of any handbill or sign to any sidewalk, crosswalk, curb, lamppost, hydrant, or lifesaving equipment.[20] Their

---

[20] Brief for Appellees 22, n. 16. In his affidavit in support of the motion for partial summary judgment, the president of COGS stated:

"No COGS signs are posted on sidewalk surfaces, streetlamp posts, hydrants, trees, shrubs, treestacks or guards, vertical utility poles, fire alarm or police telegraph systems, drinking fountains, lifebuoys, life preservers, lifesaving equipment or street or traffic signs."

position with respect to utility poles is not entirely clear, but they do contend that it is unconstitutional to prohibit the attachment of their cardboard signs to the horizontal cross-wires supporting utility poles during a political campaign. They have, in short, failed to identify any significant difference between their claim that the ordinance is invalid on overbreadth grounds and their claim that it is unconstitutional when applied to their political signs. Specifically, Taxpayers and COGS have not attempted to demonstrate that the ordinance applies to any conduct more likely to be protected by the First Amendment than their own crosswire signs. Indeed, the record suggests that many of the signs posted in violation of the ordinance are posted in such a way that they may create safety or traffic problems that COGS has tried to avoid. Accordingly, on this record it appears that if the ordinance may be validly applied to COGS, it can be validly applied to most if not all of the signs of parties not before the Court. Appellees have simply failed to demonstrate a realistic danger that the ordinance will significantly compromise recognized First Amendment protections of individuals not before the Court. It would therefore be inappropriate in this case to entertain an overbreadth challenge to the ordinance.

Taxpayers and COGS do argue generally that the City's interest in eliminating visual blight is not sufficiently weighty to justify an abridgment of speech. If that were the only interest the ordinance advanced, then this argument would be analogous to the facial challenges involved in cases like *Stromberg* and *Lovell*. But as previously observed, appellees acknowledge that the ordinance serves safety interests in many of its applications, and hence do not argue that the ordinance can never be validly applied. Instead, appellees argue that they have placed their signs in locations where only the esthetic interest is implicated. In addition, they argue that they have developed an expertise in not "placing signs in offensive manners which will alienate its own clien-

tele or their constituencies,"[21] and emphasize the special value of free communication during political campaigns, see *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 555 (1981) (STEVENS, J., dissenting in part); *id.*, at 550 (REHNQUIST, J., dissenting). In light of these arguments, appellees' attack on the ordinance is basically a challenge to the ordinance as applied to their activities. We therefore limit our analysis of the constitutionality of the ordinance to the concrete case before us, and now turn to the arguments that it is invalid as applied to the expressive activity of Taxpayers and COGS.[22]

## II

The ordinance prohibits appellees from communicating with the public in a certain manner, and presumably diminishes the total quantity of their communication in the City.[23] The application of the ordinance to appellees' expressive activities surely raises the question whether the ordinance abridges their "freedom of speech" within the meaning of the First Amendment, and appellees certainly have standing to challenge the application of the ordinance to their own expressive activities. "But to say the ordinance presents a

---

[21] See App. 148.

[22] The fact that the ordinance is capable of valid applications does not necessarily mean that it is valid as applied to these litigants. We may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgment of expressive activity. *Landmark Communications, Inc.* v. *Virginia*, 435 U. S. 829, 844 (1978). See also *Brown* v. *Socialist Workers '74 Campaign Committee*, 459 U. S. 87, 95–98 (1983); *In re Primus*, 436 U. S. 412, 433–438 (1978); *Buckley* v. *Valeo*, 424 U. S. 1, 45–48, 68–74 (1976) *(per curiam); Police Department of Chicago* v. *Mosley*, 408 U. S. 92, 100–101 (1972); *Stanley* v. *Georgia*, 394 U. S. 557, 566–567 (1969); *United States* v. *Robel*, 389 U. S. 258, 264, 267 (1967); *Mine Workers* v. *Illinois Bar Assn.*, 389 U. S. 217, 222–223 (1967); *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 462–465 (1958).

[23] Although Taxpayers would presumably devote the resources now expended on posting political signs on public property to other forms of communication if they complied with the ordinance, we shall assume that the ordinance diminishes the total quantity of their speech.

First Amendment *issue* is not necessarily to say that it constitutes a First Amendment *violation*." *Metromedia, Inc.* v. *San Diego*, 453 U. S., at 561 (BURGER, C. J., dissenting). It has been clear since this Court's earliest decisions concerning the freedom of speech that the state may sometimes curtail speech when necessary to advance a significant and legitimate state interest. *Schenck* v. *United States*, 249 U. S. 47, 52 (1919).

As *Stromberg* and *Lovell* demonstrate, there are some purported interests—such as a desire to suppress support for a minority party or an unpopular cause, or to exclude the expression of certain points of view from the marketplace of ideas—that are so plainly illegitimate that they would immediately invalidate the rule. The general principle that has emerged from this line of cases is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others. See *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 65, 72 (1983); *Consolidated Edison Co.* v. *Public Service Comm'n*, 447 U. S. 530, 535–536 (1980); *Carey* v. *Brown*, 447 U. S. 455, 462–463 (1980); *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 63–65, 67–68 (1976) (plurality opinion); *Police Department of Chicago* v. *Mosley*, 408 U. S. 92, 95–96 (1972).

That general rule has no application to this case. For there is not even a hint of bias or censorship in the City's enactment or enforcement of this ordinance. There is no claim that the ordinance was designed to suppress certain ideas that the City finds distasteful or that it has been applied to appellees because of the views that they express. The text of the ordinance is neutral—indeed it is silent—concerning any speaker's point of view, and the District Court's findings indicate that it has been applied to appellees and others in an evenhanded manner.

In *United States* v. *O'Brien*, 391 U. S. 367 (1968), the Court set forth the appropriate framework for reviewing a viewpoint-neutral regulation of this kind:

"[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.*, at 377.

It is well settled that the state may legitimately exercise its police powers to advance esthetic values. Thus, in *Berman* v. *Parker*, 348 U. S. 26, 32–33 (1954), in referring to the power of the legislature to remove blighted housing, this Court observed that such housing may be "an ugly sore, a blight on the community which robs it of charm, which makes it a place from which men turn." *Ibid.* We concluded: "The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary." *Id.*, at 33 (citation omitted). See also *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104, 129 (1978); *Village of Belle Terre* v. *Boraas*, 416 U. S. 1, 9 (1974); *Euclid* v. *Ambler Co.*, 272 U. S. 365, 387–388 (1926); *Welch* v. *Swasey*, 214 U. S. 91, 108 (1909).

In this case, taxpayers and COGS do not dispute that it is within the constitutional power of the City to attempt to improve its appearance, or that this interest is basically unrelated to the suppression of ideas. Therefore the critical inquiries are whether that interest is sufficiently substantial to justify the effect of the ordinance on appellees' expression, and whether that effect is no greater than necessary to accomplish the City's purpose.

## III

In *Kovacs* v. *Cooper*, 336 U. S. 77 (1949), the Court rejected the notion that a city is powerless to protect its citizens from unwanted exposure to certain methods of expression which may legitimately be deemed a public nuisance.

In upholding an ordinance that prohibited loud and raucous sound trucks, the Court held that the State had a substantial interest in protecting its citizens from unwelcome noise.[24]   In *Lehman* v. *City of Shaker Heights*, 418 U. S. 298 (1974), the Court upheld the city's prohibition of political advertising on its buses, stating that the city was entitled to protect unwilling viewers against intrusive advertising that may interfere with the city's goal of making its buses "rapid, convenient, pleasant, and inexpensive," *id.*, at 302–303 (plurality opinion).   See also *id.*, at 307 (Douglas, J., concurring in judgment); *Erznoznik* v. *City of Jacksonville*, 422 U. S., at 209, and n. 5.   These cases indicate that the municipalities have a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression.

*Metromedia, Inc.* v. *San Diego, supra,* dealt with San Diego's prohibition of certain forms of outdoor billboards. There the Court considered the city's interest in avoiding visual clutter, and seven Justices explicitly concluded

---

[24] Justice Reed wrote:

"The unwilling listener is not like the passer-by who may be offered a pamphlet in the street but cannot be made to take it.   In his home or on the street he is practically helpless to escape this interference with his privacy by loud speakers except through the protection of the municipality.

"City streets are recognized as a normal place for the exchange of ideas by speech or paper.   But this does not mean the freedom is beyond all control.   We think it is a permissible exercise of legislative discretion to bar sound trucks with broadcasts of public interest, amplified to a loud and raucous volume, from the public ways of municipalities.   On the business streets of cities like Trenton, with its more than 125,000 people, such distractions would be dangerous to traffic at all hours useful for the dissemination of information, and in the residential thoroughfares the quiet and tranquility so desirable for city dwellers would likewise be at the mercy of advocates of particular religious, social or political persuasions.   We cannot believe that rights of free speech compel a municipality to allow such mechanical voice amplification on any of its streets."   336 U. S., at 86–87 (plurality opinion).

A majority of the Court agreed with this analysis.   See *id.*, at 96–97 (Frankfurter, J., concurring); *id.*, at 97–98 (Jackson, J., concurring).

that this interest was sufficient to justify a prohibition of billboards, see *id.*, at 507–508, 510 (opinion of WHITE, J., joined by Stewart, MARSHALL, and POWELL, JJ.); *id.*, at 552 (STEVENS, J., dissenting in part); *id.*, at 559–561 (BURGER, C. J., dissenting); *id.*, at 570 (REHNQUIST, J., dissenting).[25] JUSTICE WHITE, writing for the plurality, expressly concluded that the city's esthetic interests were sufficiently substantial to provide an acceptable justification for a content-neutral prohibition against the use of billboards; San Diego's interest in its appearance was undoubtedly a substantial governmental goal. *Id.*, at 507–508.[26]

We reaffirm the conclusion of the majority in *Metromedia.* The problem addressed by this ordinance—the visual assault on the citizens of Los Angeles presented by an accumulation of signs posted on public property—constitutes a significant substantive evil within the City's power to prohibit. "[T]he city's interest in attempting to preserve [or improve] the quality of urban life is one that must be accorded high respect." *Young* v. *American Mini Theatres, Inc.*, 427 U. S., at 71 (plurality opinion).

---

[25] The Court of Appeals relied on JUSTICE BRENNAN's opinion concurring in the judgment in *Metromedia* to support its conclusion that the City's interest in esthetics was not sufficiently substantial to outweigh the constitutional interest in free expression unless the City proved that it had undertaken a comprehensive and coordinated effort to remove other elements of visual clutter within San Diego. This reliance was misplaced because JUSTICE BRENNAN's analysis was expressly rejected by a majority of the Court. Moreover, JUSTICE BRENNAN was concerned that the San Diego ordinance might not in fact have a substantial salutary effect on the appearance of the city because it did not ameliorate other types of visual clutter beside billboards, see 453 U. S., at 530–534, thus suggesting that in fact it had been applied to areas where it did not advance the interest in esthetics sufficiently to justify an abridgment of speech.

[26] Similarly, THE CHIEF JUSTICE wrote that a city has the power to regulate visual clutter in much the same manner that it can regulate any other feature of its environment: "Pollution is not limited to the air we breathe and the water we drink; it can equally offend the eye and ear." *Id.*, at 561 (dissenting opinion).

## IV

We turn to the question whether the scope of the restriction on appellees' expressive activity is substantially broader than necessary to protect the City's interest in eliminating visual clutter. The incidental restriction on expression which results from the City's attempt to accomplish such a purpose is considered justified as a reasonable regulation of the time, place, or manner of expression if it is narrowly tailored to serve that interest. See, *e. g., Heffron* v. *International Society for Krishna Consciousness, Inc.,* 452 U. S. 640, 647–648 (1981); *Schad* v. *Mount Ephraim,* 452 U. S. 61, 68–71 (1981); *Carey* v. *Brown,* 447 U. S., at 470–471 (1980); *Grayned* v. *City of Rockford,* 408 U. S. 104, 115–117 (1972); *Police Department of Chicago* v. *Mosley,* 408 U. S., at 98. The District Court found that the signs prohibited by the ordinance do constitute visual clutter and blight. By banning these signs, the City did no more than eliminate the exact source of the evil it sought to remedy.[27] The plurality wrote in *Metromedia:* "It is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm.'" 453 U. S., at 510. The same is true of posted signs.

It is true that the esthetic interest in preventing the kind of litter that may result from the distribution of leaflets on the public streets and sidewalks cannot support a prophylactic prohibition against the citizen's exercise of that method of expressing his views. In *Schneider* v. *State,* 308 U. S. 147 (1939), the Court held that ordinances that absolutely prohibited handbilling on the streets were invalid. The Court explained that cities could adequately protect the esthetic inter-

---

[27] In *Metromedia,* a majority of the Court concluded that a prohibition on billboards was narrowly tailored to the visual evil San Diego sought to correct. See 453 U. S., at 510–512 (plurality opinion); *id.,* at 549–553 (STEVENS, J., dissenting in part); *id.,* at 560–561 (BURGER, C. J., dissenting); *id.,* at 570 (REHNQUIST, J., dissenting).

est in avoiding litter without abridging protected expression merely by penalizing those who actually litter. See *id.*, at 162. Taxpayers contend that their interest in supporting Vincent's political campaign, which affords them a constitutional right to distribute brochures and leaflets on the public streets of Los Angeles, provides equal support for their asserted right to post temporary signs on objects adjacent to the streets and sidewalks. They argue that the mere fact that their temporary signs "add somewhat" to the city's visual clutter is entitled to no more weight than the temporary unsightliness of discarded handbills and the additional street-cleaning burden that were insufficient to justify the ordinances reviewed in *Schneider*.

The rationale of *Schneider* is inapposite in the context of the instant case. There, individual citizens were actively exercising their right to communicate directly with potential recipients of their message. The conduct continued only while the speakers or distributors remained on the scene. In this case, appellees posted dozens of temporary signs throughout an area where they would remain unattended until removed. As the Court expressly noted in *Schneider*, the First Amendment does not "deprive a municipality of power to enact regulations against throwing literature broadcast in the streets. Prohibition of such conduct would not abridge the constitutional liberty since such activity bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion." 308 U. S., at 160–161. In short, there is no constitutional impediment to "the punishment of those who actually throw papers on the streets." *Id.*, at 162. A distributor of leaflets has no right simply to scatter his pamphlets in the air—or to toss large quantities of paper from the window of a tall building or a low flying airplane. Characterizing such an activity as a separate means of communication does not diminish the State's power to condemn it as a public nuisance. The right recognized in

*Schneider* is to tender the written material to the passerby who may reject it or accept it, and who thereafter may keep it, dispose of it properly, or incur the risk of punishment if he lets it fall to the ground. One who is rightfully on a street open to the public "carries with him there as elsewhere the constitutional right to express his views in an orderly fashion. This right extends to the communication of ideas by handbills and literature as well as by the spoken word." *Jamison* v. *Texas*, 318 U. S. 413, 416 (1943); see also *Cox* v. *Louisiana*, 379 U. S. 559, 578 (1965) (Black, J., dissenting in part).

With respect to signs posted by appellees, however, it is the tangible medium of expressing the message that has the adverse impact on the appearance of the landscape. In *Schneider*, an antilittering statute could have addressed the substantive evil without prohibiting expressive activity, whereas application of the prophylactic rule actually employed gratuitously infringed upon the right of an individual to communicate directly with a willing listener. Here, the substantive evil—visual blight—is not merely a possible byproduct of the activity, but is created by the medium of expression itself. In contrast to *Schneider*, therefore, the application of the ordinance in this case responds precisely to the substantive problem which legitimately concerns the City. The ordinance curtails no more speech than is necessary to accomplish its purpose.

## V

The Court of Appeals accepted the argument that a prohibition against the use of unattractive signs cannot be justified on esthetic grounds if it fails to apply to all equally unattractive signs wherever they might be located. A comparable argument was categorically rejected in *Metromedia*. In that case it was argued that the city could not simultaneously permit billboards to be used for onsite advertising and also justify the prohibition against offsite advertising on esthetic grounds, since both types of advertising were equally un-

attractive. The Court held, however, that the city could reasonably conclude that the esthetic interest was outweighed by the countervailing interest in one kind of advertising even though it was not outweighed by the other.[28] So here, the validity of the esthetic interest in the elimination of signs on public property is not compromised by failing to extend the ban to private property. The private citizen's interest in controlling the use of his own property justifies the disparate treatment. Moreover, by not extending the ban to all locations, a significant opportunity to communicate by means of temporary signs is preserved, and private property owners' esthetic concerns will keep the posting of signs on their property within reasonable bounds. Even if some visual blight remains, a partial, content-neutral ban may nevertheless enhance the City's appearance.

Furthermore, there is no finding that in any area where appellees seek to place signs, there are already so many signs posted on adjacent private property that the elimination of appellees' signs would have an inconsequential effect on the esthetic values with which the City is concerned. There is simply no predicate in the findings of the District Court for

---

[28] "In the first place, whether onsite advertising is permitted or not, the prohibition of offsite advertising is directly related to the stated objectives of traffic safety and esthetics. This is not altered by the fact that the ordinance is underinclusive because it permits onsite advertising." 453 U. S., at 511.

"Third, San Diego has obviously chosen to value one kind of commercial speech—onsite advertising—more than another kind of commercial speech—offsite advertising. The ordinance reflects a decision by the city that the former interest, but not the latter, is stronger than the city's interests in traffic safety and esthetics. The city has decided that in a limited instance—onsite commercial advertising—its interests should yield. We do not reject that judgment." *Id.*, at 512.

THE CHIEF JUSTICE, JUSTICE REHNQUIST, and JUSTICE STEVENS agreed with the plurality on this point. *Id.*, at 541 (STEVENS, J., dissenting in part); *id.*, at 563–564 (BURGER, C. J., dissenting); *id.*, at 570 (REHNQUIST, J., dissenting).

the conclusion that the prohibition against the posting of appellees' signs fails to advance the City's esthetic interest.

## VI

While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S., at 647, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate. See, *e. g.*, *United States* v. *Grace*, 461 U. S. 171, 177 (1983); *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S., at 654–655; *Consolidated Edison Co.* v. *Public Service Comm'n*, 447 U. S., at 535; *Linmark Associates, Inc.* v. *Willingboro*, 431 U. S. 85, 93 (1977). The Los Angeles ordinance does not affect any individual's freedom to exercise the right to speak and to distribute literature in the same place where the posting of signs on public property is prohibited.[29] To the extent that the posting of signs on public property has advantages over these forms of expression, see, *e. g.*, *Talley* v. *California*, 362 U. S. 60, 64–65 (1960), there is no reason to believe that these same advantages cannot be obtained through other means. To the contrary, the findings of the District Court indicate that there are ample alternative modes of communication in Los Angeles. Notwithstanding appellees' general assertions in their brief concerning the utility of political posters, nothing in the findings indicates that the posting of political posters on public property is a uniquely valuable or important mode of communication, or that appellees' ability to communicate effectively is threatened by ever-increasing restrictions on expression.[30]

---

[29] Cf. *Schneider* v. *State*, 308 U. S., at 163 ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place").

[30] Although the Court has shown special solicitude for forms of expression that are much less expensive than feasible alternatives and hence may be

## VII

Appellees suggest that the public property covered by the ordinance either is itself a "public forum" for First Amendment purposes, or at least should be treated in the same respect as the "public forum" in which the property is located. "Traditional public forum property occupies a special position in terms of First Amendment protection," *United States* v. *Grace*, 461 U. S., at 180, and appellees maintain that their sign-posting activities are entitled to this protection.

In *Hague* v. *CIO*, 307 U. S. 496, 515–516 (1939) (opinion of Roberts, J.), it was recognized:

"Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and

important to a large segment of the citizenry, see, *e. g.*, *Martin* v. *Struthers*, 319 U. S. 141, 146 (1943) ("Door to door distribution of circulars is essential to the poorly financed causes of little people"), this solicitude has practical boundaries, see, *e. g.*, *Kovacs* v. *Cooper*, 336 U. S. 77, 88–89 (1949) ("That more people may be more easily and cheaply reached by sound trucks . . . is not enough to call forth constitutional protection for what those charged with public welfare reasonably think is a nuisance when easy means of publicity are open"). See also *Metromedia, Inc.* v. *San Diego*, 453 U. S., at 549–550 (STEVENS, J., dissenting in part) (ban on graffiti constitutionally permissible even though some creators of graffiti may have no equally effective alternative means of public expression).

good order; but it must not, in the guise of regulation, be abridged or denied."

See also *Grayned* v. *City of Rockford*, 408 U. S., at 115; *Shuttlesworth* v. *City of Birmingham*, 394 U. S. 147, 152 (1969); *Kunz* v. *New York*, 340 U. S. 290, 293 (1951); *Schneider* v. *State*, 308 U. S., at 163.

Appellees' reliance on the public forum doctrine is misplaced. They fail to demonstrate the existence of a traditional right of access respecting such items as utility poles for purposes of their communication comparable to that recognized for public streets and parks, and it is clear that "the First Amendment does not guarantee access to government property simply because it is owned or controlled by the government." *United States Postal Service* v. *Greenburgh Civic Assns.*, 453 U. S. 114, 129 (1981). Rather, the "existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 44 (1983).

Lampposts can of course be used as signposts, but the mere fact that government property can be used as a vehicle for communication does not mean that the Constitution requires such uses to be permitted. Cf. *United States Postal Service* v. *Greenburgh Civic Assns.*, 453 U. S., at 131.[31] Public property which is not by tradition or designation a forum for

---

[31] Any tangible property owned by the government could be used to communicate—bumper stickers may be placed on official automobiles—and yet appellees could not seriously claim the right to attach "Taxpayer for Vincent" bumper stickers to city-owned automobiles. At some point, the government's relationship to things under its dominion and control is virtually identical to a private owner's property interest in the same kinds of things, and in such circumstances, the State, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley* v. *Florida*, 385 U. S. 39, 47 (1966).

public communication may be reserved by the State "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S., at 46. Given our analysis of the legitimate interest served by the ordinance, its viewpoint neutrality, and the availability of alternative channels of communication, the ordinance is certainly constitutional as applied to appellees under this standard.[32]

## VIII

Finally, Taxpayers and COGS argue that Los Angeles could have written an ordinance that would have had a less severe effect on expressive activity such as theirs, by permitting the posting of any kind of sign at any time on some types of public property, or by making a variety of other more specific exceptions to the ordinance: for signs carrying certain types of messages (such as political campaign signs), for signs posted during specific time periods (perhaps during political campaigns), for particular locations (perhaps for areas already cluttered by an excessive number of signs on adjacent private property), or for signs meeting design specifications (such as size or color). Plausible public policy arguments

---

[32] Just as it is not dispositive to label the posting of signs on public property as a discrete medium of expression, it is also of limited utility in the context of this case to focus on whether the tangible property itself should be deemed a public forum. Generally an analysis of whether property is a public forum provides a workable analytical tool. However, "the analytical line between a regulation of the 'time, place, and manner' in which First Amendment rights may be exercised in a traditional public forum, and the question of whether a particular piece of personal or real property owned or controlled by the government is in fact a 'public forum' may blur at the edges," *United States Postal Service* v. *Greenburgh Civic Assns.*, 453 U. S. 114, 132 (1981), and this is particularly true in cases falling between the paradigms of government property interests essentially mirroring analogous private interests and those clearly held in trust, either by tradition or recent convention, for the use of citizens at large.

might well be made in support of any such exception, but it by no means follows that it is therefore constitutionally mandated, cf. *Singer* v. *United States*, 380 U. S. 24, 34–35 (1965), nor is it clear that some of the suggested exceptions would even be constitutionally permissible. For example, even though political speech is entitled to the fullest possible measure of constitutional protection, there are a host of other communications that command the same respect. An assertion that "Jesus Saves," that "Abortion is Murder," that every woman has the "Right to Choose," or that "Alcohol Kills," may have a claim to a constitutional exemption from the ordinance that is just as strong as "Roland Vincent—City Council." See *Abood* v. *Detroit Board of Education*, 431 U. S. 209, 231–232 (1977).[33] To create an exception for appellees' political speech and not these other types of speech might create a risk of engaging in constitutionally forbidden content discrimination. See, *e. g., Carey* v. *Brown*, 447 U. S. 455 (1980); *Police Department of Chicago* v. *Mosley*, 408 U. S. 92 (1972). Moreover, the volume of permissible postings under such a mandated exemption might so limit the ordinance's effect as to defeat its aim of combating visual blight.

Any constitutionally mandated exception to the City's total prohibition against temporary signs on public property would necessarily rest on a judicial determination that the City's traffic control and safety interests had little or no applicability within the excepted category, and that the City's interests in esthetics are not sufficiently important to justify the prohibition in that category. But the findings of the District Court provide no basis for questioning the substantiality of the esthetic interest at stake, or for believing that a uniquely important form of communication has been abridged for the categories of expression engaged in by Taxpayers and COGS. Therefore, we accept the City's position that it may decide that the esthetic interest in avoiding "visual clutter" justifies

---

[33] See generally *Mine Workers* v. *Illinois State Bar Assn.*, 389 U. S. 217, 223 (1967).

a removal of signs creating or increasing that clutter. The findings of the District Court that COGS signs add to the problems addressed by the ordinance and, if permitted to remain, would encourage others to post additional signs, are sufficient to justify application of the ordinance to these appellees.

As recognized in *Metromedia*, if the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, "then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them." 453 U. S., at 508. As is true of billboards, the esthetic interests that are implicated by temporary signs are presumptively at work in all parts of the city, including those where appellees posted their signs, and there is no basis in the record in this case upon which to rebut that presumption. These interests are both psychological and economic. The character of the environment affects the quality of life and the value of property in both residential and commercial areas. We hold that on this record these interests are sufficiently substantial to justify this content-neutral, impartially administered prohibition against the posting of appellees' temporary signs on public property and that such an application of the ordinance does not create an unacceptable threat to the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964).[34]

The judgment of the Court of Appeals is reversed, and the case is remanded to that Court.

*It is so ordered.*

---

[34] Taxpayers and COGS also argue that the ordinance violates the Equal Protection Clause of the Fourteenth Amendment because (1) it contains certain exceptions for street banners and certain permanent signs such as commemorative plaques, and (2) it gives property owners, who may authorize the posting of signs on their own premises, an advantage over nonproperty owners in political campaigns. These arguments do not appear to have been addressed by the Court of Appeals.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

The plurality opinion in *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490 (1981), concluded that the City of San Diego could, consistently with the First Amendment, restrict the commercial use of billboards in order to "preserve and improve the appearance of the City." *Id.*, at 493. Today, the Court sustains the constitutionality of Los Angeles' similarly motivated ban on the posting of political signs on public property. Because the Court's lenient approach towards the restriction of speech for reasons of aesthetics threatens seriously to undermine the protections of the First Amendment, I dissent.

The Court finds that the City's "interest [in eliminating visual clutter] is sufficiently substantial to justify the effect of the ordinance on appellees' expression" and that the effect of the ordinance on speech is "no greater than necessary to accomplish the City's purpose." *Ante*, at 805. These are the right questions to consider when analyzing the constitutionality of the challenged ordinance, see *Metromedia, supra*, at 525–527 (BRENNAN, J., concurring in judgment); *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640, 656 (1981) (BRENNAN, J., concurring in part and dissenting in part), but the answers that the Court provides reflect a startling insensitivity to the principles embodied in the First Amendment. In my view, the City of Los Angeles has not shown that its interest in eliminating "visual clutter" justifies its restriction of appellees' ability to communicate with the local electorate.

I

The Court recognizes that each medium for communicating ideas and information presents its own particular problems. Our analysis of the First Amendment concerns implicated by a given medium must therefore be sensitive to these particular problems and characteristics. The posting of signs is,

of course, a time-honored means of communicating a broad range of ideas and information, particularly in our cities and towns. At the same time, the unfettered proliferation of signs on public fixtures may offend the public's legitimate desire to preserve an orderly and aesthetically pleasing urban environment. In this case, as in *Metromedia*, we are called upon to adjudge the constitutionality under the First Amendment of a local government's response to this recurring dilemma—namely, the clash between the public's aesthetic interest in controlling the use of billboards, signs, handbills, and other similar means of communication, and the First Amendment interest of those who wish to use these media to express their views, or to learn the views of others, on matters of importance to the community.

In deciding this First Amendment question, the critical importance of the posting of signs as a means of communication must not be overlooked. Use of this medium of communication is particularly valuable in part because it entails a relatively small expense in reaching a wide audience, allows flexibility in accommodating various formats, typographies, and graphics, and conveys its message in a manner that is easily read and understood by its reader or viewer. There may be alternative channels of communication, but the prevalence of a large number of signs in Los Angeles[1] is a strong indication that, for many speakers, those alternatives are far less satisfactory. Cf. *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546, 556 (1975).

Nevertheless, the City of Los Angeles asserts that ample alternative avenues of communication are available. The City notes that, although the posting of signs on public property is prohibited, the posting of signs on private property and the distribution of handbills are not. Brief for Appellants

---

[1] According to the Court of Appeals, street inspection personnel removed 51,662 illegally posted signs between January 1, 1980, and May 24, 1980. 682 F. 2d 847, 853, n. 6. (1982).

25–26. But there is no showing that either of these alternatives would serve appellees' needs nearly as well as would the posting of signs on public property. First, there is no proof that a sufficient number of private parties would allow the posting of signs on their property. Indeed, common sense suggests the contrary at least in some instances. A speaker with a message that is generally unpopular or simply unpopular among property owners is hardly likely to get his message across if forced to rely on this medium. It is difficult to believe, for example, that a group advocating an increase in the rate of a property tax would succeed in persuading private property owners to accept its signs.

Similarly, the adequacy of distributing handbills is dubious, despite certain advantages of handbills over signs. See *Martin* v. *Struthers*, 319 U. S. 141, 145–146 (1943). Particularly when the message to be carried is best expressed by a few words or a graphic image, a message on a sign will typically reach far more people than one on a handbill. The message on a posted sign remains to be seen by passersby as long as it is posted, while a handbill is typically read by a single reader and discarded. Thus, not only must handbills be printed in large quantity, but many hours must be spent distributing them. The average cost of communicating by handbill is therefore likely to be far higher than the average cost of communicating by poster. For that reason, signs posted on public property are doubtless "essential to the poorly financed causes of little people," *id.*, at 146, and their prohibition constitutes a total ban on an important medium of communication. Cf. Stone, Fora Americana: Speech in Public Places, 1974 S. Ct. Rev. 233, 257. Because the City has completely banned the use of this particular medium of communication, and because, given the circumstances, there are no equivalent alternative media that provide an adequate substitute, the Court must examine with particular care the justifications that the City proffers for its ban. See *Metromedia, supra,* at 525–527 (BRENNAN, J., concur-

ring in judgment); *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85, 93 (1977).

## II

As the Court acknowledges, *ante,* at 805, when an ordinance significantly limits communicative activity, "the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation." *Schneider* v. *State,* 308 U. S. 147, 161 (1939). The Court's first task is to determine whether the ordinance is aimed at suppressing the content of speech, and, if it is, whether a compelling state interest justifies the suppression. *Consolidated Edison Co.* v. *Public Service Comm'n,* 447 U. S. 530, 540 (1980); *Police Department of Chicago* v. *Mosley,* 408 U. S. 92, 99 (1972). If the restriction is content-neutral, the court's task is to determine (1) whether the governmental objective advanced by the restriction is substantial, and (2) whether the restriction imposed on speech is no greater than is essential to further that objective. Unless both conditions are met the restriction must be invalidated. See *ante,* at 805, 808, 810.[2]

My suggestion in *Metromedia* was that courts should exercise special care in addressing these questions when a purely aesthetic objective is asserted to justify a restriction of speech. Specifically, "before deferring to a city's judgment, a court must be convinced that the city is seriously and comprehensively addressing aesthetic concerns with respect to its environment." 453 U. S., at 531. I adhere to that view. Its correctness—premised largely on my concern that aesthetic interests are easy for a city to assert and difficult for a court to evaluate—is, for me, reaffirmed by this case.

The fundamental problem in this kind of case is that a purely aesthetic state interest offered to justify a restriction on speech—that is, a governmental objective justified solely

---

[2] Of course, a content-neutral restriction must also leave open ample alternative avenues of communication. See *supra,* at 819–820, and this page.

in terms like "proscribing intrusive and unpleasant formats for expression," *ante*, at 806—creates difficulties for a reviewing court in fulfilling its obligation to ensure that government regulation does not trespass upon protections secured by the First Amendment. The source of those difficulties is the unavoidable subjectivity of aesthetic judgments—the fact that "beauty is in the eye of the beholder." As a consequence of this subjectivity, laws defended on aesthetic grounds raise problems for judicial review that are not presented by laws defended on more objective grounds—such as national security, public health, or public safety.[3] In practice, therefore, the inherent subjectivity of aesthetic judgments makes it all too easy for the government to fashion its justification for a law in a manner that impairs the ability of a reviewing court meaningfully to make the required inquiries.[4]

## A

Initially, a reviewing court faces substantial difficulties determining whether the actual objective is related to the suppression of speech. The asserted interest in aesthetics may be only a facade for content-based suppression. Of course, all would agree that the improvement and preser-

---

[3] Safety, health, and national security have their subjective aspects as well, but they are not wholly subjective. When these objectives are invoked to justify a restriction of speech, courts can broadly judge their plausibility. This is not true of aesthetics.

[4] As one scholar has stated:

"Aesthetic policy, as currently formulated and implemented at the federal, state, and local levels, often partakes more of high farce than of the rule of law. Its purposes are seldom accurately or candidly portrayed, let alone understood, by its most vehement champions. Its diversion to dubious or flatly deplorable social ends undermines the credit that it may merit when soundly conceived and executed. Its indiscriminate, often quixotic demands have overwhelmed legal institutions, which all too frequently have compromised the integrity of legislative, administrative, and judicial processes in the name of 'beauty.'" Costonis, Law and Aesthetics: A Critique and a Reformation of the Dilemmas, 80 Mich. L. Rev. 355 (1982).

vation of the aesthetic environment are important governmental functions, and that some restrictions on speech may be necessary to carry out these functions. *Metromedia, supra,* at 530. But a governmental interest in aesthetics cannot be regarded as sufficiently compelling to justify a restriction of speech based on an assertion that the content of the speech is, in itself, aesthetically displeasing. *Cohen* v. *California,* 403 U. S. 15 (1971). Because aesthetic judgments are so subjective, however, it is too easy for government to enact restrictions on speech for just such illegitimate reasons and to evade effective judicial review by asserting that the restriction is aimed at some displeasing aspect of the speech that is not solely communicative—for example, its sound, its appearance, or its location. An objective standard for evaluating claimed aesthetic judgments is therefore essential; for without one, courts have no reliable means of assessing the genuineness of such claims.

For example, in evaluating the ordinance before us in this case, the City might be pursuing either of two objectives, motivated by two very different judgments. One objective might be the elimination of "visual clutter," attributable in whole or in part to signs posted on public property. The aesthetic judgment underlying this objective would be that the clutter created by these signs offends the community's desire for an orderly, visually pleasing environment. A second objective might simply be the elimination of the messages typically carried by the signs.[5] In that case, the aesthetic judgment would be that the signs' messages are themselves displeasing. The first objective is lawful, of course, but the second is not. Yet the City might easily mask the second

---

[5] The fact that a ban on temporary signs applies to all signs does not necessarily imply content-neutrality. Because particular media are often used disproportionately for certain types of messages, a restriction that is content-neutral on its face may, in fact, be content-hostile. Cf. Stone, Fora Americana: Speech in Public Places, 1974 S. Ct. Rev. 233, 257.

objective by asserting the first and declaring that signs constitute visual clutter. In short, we must avoid unquestioned acceptance of the City's bare declaration of an aesthetic objective lest we fail in our duty to prevent unlawful trespasses upon First Amendment protections.

### B

A total ban on an important medium of communication may be upheld only if the government proves that the ban (1) furthers a substantial government objective, and (2) constitutes the least speech-restrictive means of achieving that objective. *Schad* v. *Mount Ephraim*, 452 U. S. 61 (1981). Here too, however, meaningful judicial application of these standards is seriously frustrated.

### (1)

No one doubts the importance of a general governmental interest in aesthetics, but in order to justify a restriction of speech, the particular objective behind the restriction must be substantial. *E. g., United States* v. *Grace*, 461 U. S. 171, 177 (1983); *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45 (1983); *United States* v. *O'Brien*, 391 U. S. 367, 377 (1968). Therefore, in order to uphold a restriction of speech imposed to further an aesthetic objective, a court must ascertain the substantiality of the specific objective pursued. Although courts ordinarily defer to the government's assertion that its objective is substantial, that assertion is not immune from critical examination. See, *e. g., Schad* v. *Mount Ephraim, supra,* at 72–73. This is particularly true when aesthetic objectives underlie the restrictions. But in such cases independent judicial assessment of the substantiality of the government's interest is difficult. Because aesthetic judgments are entirely subjective, the government may too easily overstate the substantiality of its goals. Accordingly, unless courts carefully scrutinize

aesthetics-based restrictions of speech, they risk standing idly by while important media of communication are foreclosed for the sake of insubstantial governmental objectives.

(2)

Similarly, when a total ban is justified solely in terms of aesthetics, the means inquiry necessary to evaluate the constitutionality of the ban may be impeded by deliberate or unintended government manipulation. Governmental objectives that are purely aesthetic can usually be expressed in a virtually limitless variety of ways. Consequently, objectives can be tailored to fit whatever program the government devises to promote its general aesthetic interests. Once the government has identified a substantial aesthetic objective and has selected a preferred means of achieving its objective, it will be possible for the government to correct any mismatch between means and ends by redefining the ends to conform with the means.

In this case, for example, any of several objectives might be the City's actual substantial goal in banning temporary signs: (1) the elimination of all signs throughout the City, (2) the elimination of all signs in certain parts of the City, or (3) a reduction of the density of signs. Although a total ban on the posting of signs on public property would be the least restrictive means of achieving only the first objective, it would be a very effective means of achieving the other two as well. It is quite possible, therefore, that the City might select such a ban as the means by which to further its general interest in solving its sign problem, without explicitly considering which of the three specific objectives is really substantial. Then, having selected the total ban as its preferred means, the City would be strongly inclined to characterize the first objective as the substantial one. This might be done purposefully in order to conform the ban to the least-restrictive-means requirement, or it might be done inadvertently as a natural

concomitant of considering means and ends together. But regardless of why it is done, a reviewing court will be confronted with a statement of substantiality the subjectivity of which makes it impossible to question on its face.

This possibility of interdependence between means and ends in the development of policies to promote aesthetics poses a major obstacle to judicial review of the availability of alternative means that are less restrictive of speech. Indeed, when a court reviews a restriction of speech imposed in order to promote an aesthetic objective, there is a significant possibility that the court will be able to do little more than pay lipservice to the First Amendment inquiry into the availability of less restrictive alternatives. The means may fit the ends only because the ends were defined with the means in mind. In this case, for example, the City has expressed an aesthetic judgment that signs on public property constitute visual clutter throughout the City and that its objective is to eliminate visual clutter. We are then asked to determine whether that objective could have been achieved with less restriction of speech. But to ask the question is to highlight the circularity of the inquiry. Since the goal, at least as currently expressed, is essentially to eliminate all signs, the only available means of achieving that goal is to eliminate all signs.

The ease with which means can be equated with aesthetic ends only confirms the importance of close judicial scrutiny of the substantiality of such ends. See *supra*, at 824–825. In this case, for example, it is essential that the Court assess the City's ban on signs by evaluating whether the City has a substantial interest in eliminating the visual clutter caused by *all* posted signs *throughout* the City—as distinguished from an interest in banning signs in some areas or in preventing densely packed signs. If, in fact, either of the latter two objectives constitute the substantial interest underlying this ordinance, they could be achieved by means far less restric-

tive of speech than a total ban on signs, and the ban, therefore, would be invalid.

## C

Regrettably, the Court's analysis is seriously inadequate. Because the Court has failed to develop a reliable means of gauging the nature or depth of the City's commitment to pursuing the goal of eradicating "visual clutter," it simply approves the ordinance with only the most cursory degree of judicial oversight. Without stopping to consider carefully whether this supposed commitment is genuine or substantial, the Court essentially defers to the City's aesthetic judgment and in so doing precludes serious assessment of the availability of alternative means.

The Court begins by simply affirming that "[t]he problem addressed by this ordinance—the visual assault on the citizens of Los Angeles presented by an accumulation of signs posted on public property—constitutes a significant substantive end within the City's power to prohibit." *Ante*, at 807. Then, addressing the availability of less restrictive alternatives, the Court can do little more than state the unsurprising conclusion that "[b]y banning these signs, the City did no more than eliminate the exact source of the evil it sought to remedy." *Ante*, at 808. Finally, as if to explain the ease with which it reaches its conclusion, the Court notes that "[w]ith respect to signs posted by appellees . . . it is the tangible medium of expressing the message that has adverse impact on the appearance of the landscape." *Ante*, at 810. But, as I have demonstrated, it is precisely the ability of the State to make this judgment that should lead us to approach these cases with more caution.

## III

The fact that there are difficulties inherent in judicial review of aesthetics-based restrictions of speech does not imply

that government may not engage in such activities. As I have said, improvement and preservation of the aesthetic environment are often legitimate and important governmental functions. But because the implementation of these functions creates special dangers to our First Amendment freedoms, there is a need for more stringent judicial scrutiny than the Court seems willing to exercise.

In cases like this, where a total ban is imposed on a particularly valuable method of communication, a court should require the government to provide tangible proof of the legitimacy and substantiality of its aesthetic objective. Justifications for such restrictions articulated by the government should be critically examined to determine whether the government has committed itself to addressing the identified aesthetic problem.

In my view, such statements of aesthetic objectives should be accepted as substantial and unrelated to the suppression of speech only if the government demonstrates that it is pursuing an identified objective seriously and comprehensively and in ways that are unrelated to the restriction of speech. *Metromedia*, 453 U. S., at 531 (BRENNAN, J., concurring in judgment). Without such a demonstration, I would invalidate the restriction as violative of the First Amendment. By requiring this type of showing, courts can ensure that governmental regulation of the aesthetic environment remains within the constraints established by the First Amendment. First, we would have a reasonably reliable indication that it is not the content or communicative aspect of speech that the government finds unaesthetic. Second, when a restriction of speech is part of a comprehensive and seriously pursued program to promote an aesthetic objective, we have a more reliable indication of the government's own assessment of the substantiality of its objective. And finally, when an aesthetic objective is pursued on more than one front, we have a better basis upon which to ascertain its precise nature

and thereby determine whether the means selected are the least restrictive ones for achieving the objective.[6]

This does not mean that a government must address all aesthetic problems at one time or that a government should hesitate to pursue aesthetic objectives. What it does mean, however, is that when such an objective is pursued, it may not be pursued solely at the expense of First Amendment freedoms, nor may it be pursued by arbitrarily discriminating against a form of speech that has the same aesthetic characteristics as other forms of speech that are also present in the community. See *Metromedia, supra,* at 531–534 (BRENNAN, J., concurring in judgment).

Accordingly, in order for Los Angeles to succeed in defending its total ban on the posting of signs, the City would have to demonstrate that it is pursuing its goal of eliminating visual clutter in a serious and comprehensive manner. Most importantly, the City would have to show that it is pursuing its goal through programs other than its ban on signs, that at least some of those programs address the visual clutter problem through means that do not entail the restriction of speech, and that the programs parallel the ban in their stringency, geographical scope, and aesthetic focus. In this case, however, as the Court of Appeals found, there is no indication that the City has addressed its visual clutter problem in any way other than by prohibiting the posting of signs—

---

[6] It is theoretically, though remotely, possible that a form of speech could be so distinctively unaesthetic that a comprehensive program aimed at eliminating the eyesore it causes would apply only to the unpleasant form of speech. Under the approach I suggest, such a program would be invalid because it would only restrict speech, and the community, therefore, would have to tolerate the displeasing form of speech. This is no doubt a disadvantage of the approach. But at least when the form of speech that is restricted constitutes an important medium of communication and when the restriction would effect a total ban on the use of that medium, that is the price we must pay to protect our First Amendment liberties from those who would use aesthetics alone as a cloak to abridge them.

throughout the City and without regard to the density of their presence.   682 F. 2d 847, 852 (CA9 1982).   Therefore, I would hold that the prohibition violates appellees' First Amendment rights.

In light of the extreme stringency of Los Angeles' ban—barring all signs from being posted—and its wide geographical scope—covering the entire City—it might be difficult for Los Angeles to make the type of showing I have suggested. Cf. *Metromedia, supra,* at 533–534.   A more limited approach to the visual clutter problem, however, might well pass constitutional muster.   I have no doubt that signs posted on public property in certain areas—including, perhaps, parts of Los Angeles—could contribute to the type of eyesore that a city would genuinely have a substantial interest in eliminating.   These areas might include parts of the City that are particularly pristine, reserved for certain uses, designated to reflect certain themes, or so blighted that broad-gauged renovation is necessary.   Presumably, in these types of areas, the City would also regulate the aesthetic environment in ways other than the banning of temporary signs.   The City might zone such areas for a particular type of development or lack of development; it might actively create a particular type of environment; it might be especially vigilant in keeping the area clean; it might regulate the size and location of permanent signs; or it might reserve particular locations, such as kiosks, for the posting of temporary signs.   Similarly, Los Angeles might be able to attack its visual clutter problem in more areas of the City by reducing the stringency of the ban, perhaps by regulating the density of temporary signs, and coupling that approach with additional measures designed to reduce other forms of visual clutter. There are a variety of ways that the aesthetic environment can be regulated, some restrictive of speech and others not, but it is only when aesthetic regulation is addressed in a comprehensive and focused manner that we can ensure that the

goals pursued are substantial and that the manner in which they are pursued is no more restrictive of speech than is necessary.

In the absence of such a showing in this case, I believe that Los Angeles' total ban sweeps so broadly and trenches so completely on appellees' use of an important medium of political expression that it must be struck down as violative of the First Amendment.[7]

I therefore dissent.

---

[7] Although the Court does not reach the question, appellants argue that the City's interest in traffic safety provides an independent and significant justification for its ban on signs. As the Court of Appeals concluded, however, "[t]he City has not offered to prove facts that raise any genuine issue regarding traffic safety hazards with respect to the posting of signs on many of the objects covered by the ordinance." 682 F. 2d, at 852.