GANNETT OUTDOOR COMPANY OF MICHIGAN v CITY OF
TROY

Docket No. 89418. Submitted July 2, 1986, at Detroit. Decided November 4, 1986. Leave to appeal applied for.

Plaintiff, Gannett Outdoor Company of Michigan, sought permission to erect two non-accessary signs on billboards in the City of Troy. The city's chief building inspector, Gerald VandenBussche, denied the applications based upon a failure to comply with the requirements set forth in the sign ordinance of the Troy City Code. Plaintiff thereafter brought an action in the Oakland Circuit Court against defendants, City of Troy and Gerald VandenBussche, alleging violation of the constitutional protection of free speech. Plaintiff moved for partial summary judgment and the trial court, Steven N. Andrews, J., granted the motion, entering an order and judgment finding the city's sign ordinance void and unenforceable. Defendants appeal by leave granted.

The Court of Appeals *held:*

The Troy sign ordinance does not constitute an unconstitutional abridgement of the freedom of speech. The ordinance is content-neutral. The city's aesthetic interests are alone sufficient to justify billboard regulation, and the ordinance reflects the city's concern that channels of communication be left open. The ordinance makes no preference for commercial messages. Any noncommercial message is allowed in Troy, subject only to time, place and manner restrictions.

Reversed and remanded.

1. CONSTITUTIONAL LAW — FREE SPEECH — RESTRICTIONS ON FREE SPEECH.

Time, place and manner restrictions on expression are constitutionally permissible if they are justified without reference to

REFERENCES

Am Jur 2d, Advertising §§ 9, 24 *et seq.*

Am Jur 2d, Constitutional Law §§ 496 *et seq.,* 506.

Applicability to advertisements of First Amendment's quaranty of free speech and press—Federal cases. 37 L Ed 2d 1124.

Aesthetic objectives or considerations as affecting validity of zoning ordinance. 21 ALR3d 1222.

the content of the regulated speech, they serve a significant government interest, and they leave open ample alternative channels for communication of the information.

2. CONSTITUTIONAL LAW — FREE SPEECH — BILLBOARDS — AESTHETIC INTERESTS.

    A city's aesthetic interests are alone sufficient to justify the regulation of billboards in the city.

*Bodman, Longley & Dahling* (by *James J. Walsh*), for plaintiff.

*Sullivan, Ward, Bone, Tyler, Fiott & Asher, P.C.* (by *Michelle A. Thomas*), for defendants.

Before: GRIBBS, P.J., and D. F. WALSH and BEASLEY, JJ.

D. F. WALSH, J. Plaintiff Gannett Outdoor Company of Michigan applied for permission to erect two billboards in the City of Troy. Following denial of its applications by defendant Gerald VandenBussche, the city's chief building inspector, Gannett filed a multi-count complaint in circuit court. Recognizing that the proposed billboards did not comply with the requirements set forth in the sign ordinance of the Troy City Code, Gannett complained, inter alia, that the ordinance on its face constituted a violation of Gannett's "right to free speech" as guaranteed by the United States and Michigan Constitutions. US Const, Am I; Const 1963, art 1, § 5. Gannett moved for partial summary disposition pursuant to MCR 2.116(C)(10), arguing that the sign ordinance was invalid on the authority of *Metromedia, Inc v City of San Diego,* 453 US 490; 101 S Ct 2882; 69 L Ed 2d 800 (1981). The circuit court agreed, ruling that the sign ordinance was void and unenforceable. Defendants City of Troy and VandenBussche (hereinafter collectively the city) appeal by leave granted.

I

Chapters 85 and 85-A of the Troy City Code set forth detailed regulations governing the erection of signs in the city. Pursuant to Chapter 85, no sign[1] may be erected without the permission of the city's building inspector unless it comes within one of several enumerated exceptions. Those exceptions are government signs, accessory signs[2] not more than two square feet in area, signs advertising the sale or rental of realty, street signs, construction signs, temporary signs,[3] and political signs.[4] Political signs are governed by Chapter 85-A.

In all zoning districts except M-1 (light industrial), permits are available only for "accessory"

---

[1] A sign is defined as:

The use of any word, numeral, letter model, banner, flag, pennant, insignia, device, design or trademark which is affixed to, painted, or represented upon a building, structure, or parts thereof, piece of land or natural object, and which is used as or is in the nature of an announcement, direction or advertisement by attracting attention to an object, place, activity, person, product, institution, organization or business. [Chapter 85.1(1), Troy City Code.]

[2] See *infra* for discussion of "accessory signs."

[3] A temporary sign is defined as:

A display, information sign, or banner, with or without a structural frame, intended for a limited period of display, including decorative display for holidays or public demonstrations and shall not include accessory signs as defined under Section 1(a) above, or signs pertaining to sale, rent, or lease of property. [Chapter 85.1(1)(c), Troy City Code.]

[4] "Political Sign" means a sign whose message relates to: The election of a person to public office, or to a political party, or to a public issue, which shall be voted on at an election called by a public body. Signs relating to an expression of opinion may be included in this definition providing they are not signs as defined in Chapter 85. [Chapter 85-A.1(b), Troy City Code.]

signs, the definition of which is set forth in Chapter 85.1(1)(a):

> Accessory Sign: A sign which directs attention to a business or profession conducted on the premise or to a commodity, service, or entertainment primarily sold, offered, manufactured, processed, or fabricated thereon.[5]

In the M-1 district, the city allows "non-accessory" signs:

> · Non-Accessory Advertising Sign: A sign which contains a message unrelated to business or profession conducted or to a commodity, service, or entertainment, sold or offered upon the premise where such sign is located. [Chapter 85.1(1)(b), Troy City Code.]

Nonaccessory signs may not exceed twelve feet in height or three hundred square feet in area, and may not be located closer than two hundred feet from a public right of way or within one thousand feet of another nonaccessory sign located on the same side of the right of way. Chapter 85.9, Troy City Code.

Political signs may be erected, in addition to all signs permitted by Chapter 85, without a city permit. Permission to erect a political sign must be obtained from the owner of the property where the sign is to be located. Chapter 85-A.3(a), Troy City Code. The sole permissible uses for political signs are to provide:

> [I]nformation relating to the election of a person to public office, or relating to a political party,

---

[5] Chapter 85.9 of the Troy City Code contains detailed instructions concerning the height, size, location and types of accessory signs permitted in each zoning district.

or relating to a matter to be voted upon at an election called by a public body, or any other public issue or expression of opinion . . . . [Chapter 85-A.3(b), Troy City Code.]

II

In April, 1984, Gannett submitted applications to the city for permits to erect two billboards on parcels of property located in an M-1 district. The owners of the parcels had given Gannett permission to erect the billboards. The permit applications were denied because the proposed nonaccessory signs did not meet the height, size and set-back requirements of the sign ordinance.

In response to interrogatories submitted by Gannett, the city identified the following interests served by the height, size and set-back restrictions on nonaccessory signs:

> To promote traffic safety, prevent visual pollution, prevent the obstruction of light, sunshine and air, foster the most appropriate use of land, preserve and improve the appearance of the City, safeguard and enhance property values, protect public and private investment in buildings and open spaces and protect public health, safety and general welfare.

Each of these interests was also asserted in support of the restriction of nonaccessory signs to M-1 districts. That restriction was further justified by the city's interest in preventing "excessive and confusing sign displays which do not relate to the premises on which they are located."

In support of Gannett's motion for partial summary disposition, the company's vice president in charge of real estate and public relations described Gannett's standard signs and the variety of non-

commercial messages often displayed on those signs.[6]

According to defendant VandenBussche, both commercial and noncommercial messages can be displayed on accessory signs.[7] Nonaccessory signs

[6] 6. In addition to commercial advertisements, Gannett's signs are used to display political messages, public service messages, editorial messages and other noncommercial messages.

7. Gannett signs have been used by many candidates for judicial office, including candidates for the District Court, the Circuit Court, the Court of Appeals and the Supreme Court.

8. Candidates for national, state and local elective offices use Gannett's signs in their campaigns. During the fall 1984 political campaign, approximately 150 Gannett signs were used to display political messages.

9. National and local businesses use Gannett's signs to display public service messages. For example, General Motors recently designed and paid for the display of messages urging the use of seat belts and Ford is now using Gannett's signs in its campaign to promote pride in the Detroit area.

10. Gannett frequently displays on its signs, without charge, messages related to charitable causes and civic and cultural events.

11. Individuals and groups interested in particular issues, for example, abortion or arms control, have used Gannett's signs as a low-cost method of reaching a large audience. [Affidavit of Sam Evola.]

[7] 4. Chapter 85 contains a very broad definition of accessory sign. Section 85.1 defines an "accessory" sign as:

"A sign which directs attention to a business or profession conducted on the premise or to a commodity, service, or entertainment primarily sold, offered, manufactured, processed or fabricated thereon."

5. Accessory signs can contain both commercial and noncommercial messages.

6. Accessory signs can contain political and ideological messages.

7. If an abortion clinic wanted an accessory sign promoting the benefits of planned parenthood, and the sign conformed in all other respects, I would issue a permit.

8. If the Republican Headquarters wanted an accessory sign that stated: "VOTE REPUBLICAN, NOVEMBER 2ND", and the sign conformed in all other respects, I would issue a permit.

9. If MADD (Mothers Against Drunk Drivers) had an office in a commercial district and wanted an accessory sign that stated:

can also contain both commercial and noncommercial messages which, according to VandenBussche, are easily seen from Interstate 75 in Troy.[8]

In granting partial summary disposition to Gannett, the circuit court found that the Troy sign ordinance was "almost identical" to the San Diego ordinance which was declared unconstitutional in *Metromedia, Inc v City of San Diego, supra.* The court agreed with the city that the Troy ordinance allowed both commercial and noncommercial messages on either accessory or nonaccessory signs. The court nevertheless found that the accessory/nonaccessory distinction was unconstitutionally content-based. We reverse.

III

It is well settled that time, place and manner restrictions on expression are constitutionally permissible if they are justified without reference to

---

"STOP DRUNK DRIVING", and the signed [sic] conformed in all other respects, I would issue a permit. [Affidavit of Gerald VandenBussche.]

[8] 10. Chapter 85 defines nonaccessory signs very broadly. Section 85.1 defines a nonaccessory sign as:

"A sign which contains a message unrelated to business or profession conducted or to a commodity, service, or entertainment, sold or offered upon the premise where such sign is located."

11. Nonaccessory signs can contain both commercial, and noncommercial messages.

12. Nonaccessory signs can contain political and ideological messages.

13. The City of Troy recently displayed a nonaccessory billboard in an industrial district along I-75 in Troy that contained a public interest message: "stop highway blight at the source". That sign was 288 square feet in size; 11′6″ high; and 200 feet back from the I-75 right-of-way line. I drove past that sign several times and I could easily read the sign from the northbound and southbound lanes of I-75. There are several other areas along I-75 where Gannett could erect conforming billboards that could be easily read from I-75. [*Id.*]

the content of the regulated speech, they serve a significant government interest, and they leave open amply alternative channels for communication of the information. *Virginia State Board of Pharmacy v Virginia Citizens Consumer Council, Inc,* 425 US 748, 771; 96 S Ct 1817; 48 L Ed 2d 346 (1976).

The content neutrality requirement was described by Justice Stevens, speaking for a majority of Justices in *Members of the City Council of the City of Los Angeles v Taxpayers for Vincent,* 466 US 789, 804; 104 S Ct 2118; 80 L Ed 2d 772 (1984):

> [T]here are some purported interests—such as a desire to suppress support for a minority party or an unpopular cause, or to exclude the expression of certain points of view from the marketplace of ideas—that are so plainly illegitimate that they would immediately invalidate the rule. The general principle . . . is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.[9]

The *Vincent* Court concluded that the Los Angeles ordinance[10] there under consideration was content-neutral:

> [T]here is not even a hint of bias or censorship in the City's enactment or enforcement of this ordinance. There is no claim that the ordinance

---

[9] See also *Metromedia, Inc v City of San Diego, supra:*

> The essential concern embodied in the First Amendment is that government not impose its viewpoint on the public or select the topics on which public debate is permissible. [453 US 553. Dissenting opinion of Justice Stevens.]

Chief Justice Burger's analysis of the content-neutrality principle in *Metromedia* accords with that of Justice Stevens. 453 US 562 *et seq.*

[10] The ordinance prohibited the posting of signs on public property.

was designed to suppress certain ideas that the City finds distasteful or that it has been applied to appellees because of the views that they express. The text of the ordinance is neutral—indeed it is silent—concerning any speaker's point of view . . . . [466 US 804.]

A majority of the Supreme Court Justices have also concluded that the reduction of visual clutter is a sufficient government interest to justify a total ban on billboards.[11] The *Vincent* majority described the aesthetic interests of a city which are affected by billboards and temporary signs, and found that the scope of the Los Angeles ordinance was not broader than necessary to protect those interests:

These interests are both psychological and economic. The character of the environment affects the quality of life and the value of property in

[11] *Metromedia, Inc v San Diego,* 453 US 490 (1981), dealt with San Diego's prohibition of certain forms of outdoor billboards. There the Court considered the city's interest in avoiding visual clutter, and seven Justices explicitly concluded that this interest was sufficient to justify a prohibition of billboards, see *id.,* at 507-508, 510 (opinion of White, J., joined by Stewart, Marshall, and Powell, JJ.); *id.,* at 552 (Stevens, J., dissenting in part); *id.,* at 559-561 (Burger, C.J., dissenting); *id.,* at 570 (Rehnquist, J., dissenting). Justice White, writing for the plurality, expressly concluded that the city's esthetic interests were sufficiently substantial to provide an acceptable justification for a content-neutral prohibition against the use of billboards; San Diego's interest in its appearance was undoubtedly a substantial governmental goal. *Id.,* at 507-508.

We reaffirm the conclusion of the majority in *Metromedia.* The problem addressed by this ordinance—the visual assault on the citizens of Los Angeles presented by an accumulation of signs posted on public property—constitutes a significant substantive evil within the City's power to prohibit. "[T]he city's interest in attempting to preserve [or improve] the quality of urban life is one that must be accorded high respect." *Young v American Mini Theatres, Inc,* 427 US 50, 71 (1976) (plurality opinion). [*Members of the City Council of the City of Los Angeles v Taxpayers for Vincent, supra,* 466 US 806-807.]

both residential and commercial areas. [466 US 817.][12]

> [I]t is the tangible medium of expressing the message that has the adverse impact on the appearance of the landscape. . . . [T]he substantive evil—visual blight—is not merely a possible by-product of the activity, but is created by the medium of expression itself. . . . [T]he application of the ordinance in this case responds precisely to the substantive problem which legitimately concerns the City. The ordinance curtails no more speech than is necessary to accomplish its purpose. [466 US 810.]

The availability of alternative channels of communication was also addressed by the *Vincent* majority, which concluded that Los Angeles' total prohibition of the posting of signs on public property did not affect any individual's freedom to exercise the right to speak and to distribute literature in public places. 466 US 812. As the district court found in *Vincent,* individuals in Los Angeles remained free "to picket and parade, to distribute

---

[12] See also *Metromedia, Inc v City of San Diego, supra:*

> I therefore assume that some total prohibitions may be permissible. It seems to be accepted by all that a zoning regulation excluding billboards from residential neighborhoods is justified by the interest in maintaining pleasant surroundings and enhancing property values. The same interests are at work in commercial and industrial zones. Reasonable men may assign different weights to the conflicting interests, but in constitutional terms I believe the essential inquiry is the same throughout the city. For whether the ban is limited to residential areas, to the entire city except its most unsightly sections, or is citywide, it unquestionably will limit the quantity of communication. Moreover, the interests served by the ban are equally legitimate and substantial in all parts of the city. Those .interests are both psychological and economic. The character of the environment affects property values and the quality of life not only for the suburban resident but equally so for the individual who toils in a factory or invests his capital in industrial properties. [453 US 552. Dissenting opinion of Justice Stevens.]

handbills, to carry signs and to post their signs and handbills on their automobiles and on private property with the permission of the owners thereof." 466 US 795.

## IV

We are persuaded that application of these principles compels the conclusion that the Troy ordinance does not constitute an unconstitutional abridgement of the freedom of speech. The ordinance is content-neutral. It reflects no bias, censorship or preference for a particular viewpoint over another. Sign regulation in Troy is not based on the city's assessment of the desirability of the ideas expressed on proposed signs.

The city's aesthetic interests are alone sufficient to justify billboard regulation, and the ordinance reflects the city's concern that channels of communication be left open. Any message can be displayed in Troy; only time, place and manner restrictions are imposed.[13]

## V

We are not persuaded that *Metromedia, Inc v City of San Diego, supra,* compels a different result. In *Metromedia,* a divided United States Supreme Court found that San Diego's sign ordinance was invalid under the First Amendment. That ordinance generally prohibited outdoor advertising signs, allowing only those signs which designated the name of the owner or occupant of the premises where the sign was located, identified such premises or advertised goods manufactured or produced or services rendered on the premises.

---

[13] We restrict our holding to the facts presented. We note, however, that a prohibition on billboards would not necessarily run afoul of the First Amendment. See *Vincent, supra,* 466 US 808, n 27, citing the views expressed by a majority of the Justices in *Metromedia.*

Also allowed were signs coming within one of twelve statutory exceptions. The ordinance prohibited the use of billboards to convey noncommercial messages which did not fall within one of the exceptions. 453 US 493-496, ns 1-3.

Although a majority of the Court voted to strike down the San Diego ordinance on constitutional grounds, no rationale supporting the result received more than four votes.[14] As Justice Rehnquist observed in his dissenting opinion:

---

[14] Speaking for a plurality of four Justices, Justice White found no constitutional infirmity in the San Diego ordinance's regulation of commercial speech. The plurality found, however, that the ordinance ran afoul of the First Amendment in its regulation of noncommercial speech. Two fatal flaws were identified: the ordinance's preferential treatment of commercial over noncommercial speech, and its authorization of only certain kinds of noncommercial speech within the exceptions to the general ban on outdoor advertising signs. 453 US 513-515. The plurality found that the San Diego ordinance was not content-neutral. 453 US 515-517.

Justices Brennan and Blackmun, concurring in the plurality judgment, rejected the plurality's bifurcated (commercial/noncommercial) approach. 453 US 534-540. They treated the ordinance as a total prohibition of billboards and found that San Diego had failed to show that a sufficiently substantial government interest was furthered by the ban. 453 US 525-534.

Justice Stevens, dissenting, agreed with Justices Brennan and Blackmun that the San Diego ordinance presented the question of the constitutionality of a total ban of billboards. He concluded that aesthetics was a sufficient government interest to justify a total ban and he found that the San Diego ordinance was not impermissibly content-based. 453 US 540, 552-555. See n 9, *supra.*

Chief Justice Burger dissented, rejecting the plurality's commercial/noncommercial approach:

To say noncommercial speech receives a greater degree of *constitutional* protection, however, does not mean that a legislature is forbidden to afford differing degrees of *statutory* protection when the restrictions on each form of speech—commercial and noncommercial—otherwise pass constitutional muster under the standards respectively applicable.

No case in this Court creates, as the plurality suggests, a hierarchy of types of speech in which, if one type is actually protected through legislative judgment, the Constitution compels that that judgment be exercised in favor of all types ranking higher on the list. [453 US 567.]

> In a case where city planning commissions and
> zoning boards must regularly confront constitu-
> tional claims of this sort, it is a genuine misfor-
> tune to have the Court's treatment of the subject
> be a virtual Tower of Babel, from which no defini-
> tive principles can be clearly drawn . . . . [453 US
> 569.]

*Metromedia* is thus of limited assistance. We
are, in any event, persuaded that the Troy ordi-
nance is significantly dissimilar to the San Diego
ordinance considered in *Metromedia.*

The *Metromedia* plurality's finding that the San
Diego ordinance was unconstitutional in giving
more protection to commercial speech than non-
commercial speech has no application in this
case.[15] In *Metromedia,* all apparently agreed that
only purely commercial messages were allowed on
the vast majority of signs. 453 US 494, n 2.[16] In

The Chief Justice agreed that San Diego's attempts to promote
traffic safety and to preserve scenic beauty were substantial govern-
ment goals, and he would defer to the city's legislative judgment in
the selection of means to further those goals. He found that the San
Diego approach was "essentially neutral to the messages conveyed"
and that it left open other adequate means of conveying commercial,
political, social and religious messages. 453 US 561-563.

Justice Rehnquist, dissenting, stated that "aesthetic justification
alone is sufficient to sustain a total prohibition of billboards" and that
local decisions concerning aesthetics should not be open to the second-
guessing of individual judges. 453 US 570.

[15] We emphasize that no other Justice joined the plurality in its
discussion of preferential treatment of "commercial" over "noncom-
mercial" speech.

[16] Thus, under the ordinance (1) a sign advertising goods or
services available on the property where the sign is located is
allowed; (2) a sign on a building or other property advertising
goods or services produced or offered elsewhere is barred; (3)
noncommercial advertising, unless within one of the specific
exceptions, is everywhere prohibited. The occupant of property
may advertise his own goods or services; he may not advertise
the goods or services of others, nor may he display most
noncommercial messages. [453 US 503.]

contrast, nonaccessory billboards are regulated in Troy without regard to their commercial or noncommercial content. Similarly, all agree that accessory signs can contain either commercial or noncommercial messages in Troy. Accessory signs with commercial messages are regulated no less vigorously than such signs with noncommercial messages. All signs concerning public issues or containing expressions of opinion are permitted pursuant to the political sign subchapter of the city code. We find no preference for commercial messages in Troy.

Second, the *Metromedia* plurality found that the San Diego ordinance, through its exceptions, impermissibly distinguished among noncommercial messages by reference to the content of those messages.[17] Only certain kinds of noncommercial signs were allowed under the San Diego ordinance. The Troy ordinance does not offend in that way either. Any noncommercial message is allowed in Troy, subject only to time, place and manner restrictions.

VI

We conclude that the Troy sign ordinance does not, on its face, violate the First Amendment prohibition against legislative abridgement of the freedom of speech. The order of partial summary disposition is reversed, and this matter is remanded to the circuit court for proceedings not

---

[17] The plurality's discussion in this regard does not accord with the majority articulation of the content neutrality principle. See n 9, *supra,* and accompanying text.

inconsistent with this opinion. We do not retain jurisdiction.

No costs, a public question being involved.